```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2
 3    ------------------------------
       DIOMED, INC.,                )
 4              Plaintiff,          ) CIVIL ACTION NO.
                                    ) 04-10019 RGS
 5         vs                       )
                                    )
 6     ANGIODYNAMICS, INC.,         )
                Defendant.          )
 7    ------------------------------
       DIOMED, INC.,                )
 8              Plaintiff,          ) CIVIL ACTION NO.
                                    ) 04-10444 RGS
 9         vs                       )
                                    )
10     VASCULAR SOLUTIONS, INC.,)    (CONSOLIDATED UNDER
                Defendant.      )     04-10019 RGS)
11    ------------------------------
12
13
                        VOLUME II
14    ----------------------------------------------------
             Deposition of: WILLIAM APPLING
15    ----------------------------------------------------
16
17      Taken before Tina M. Davis, Stenographer and
      Notary Public in and for the State of Connecticut,
18    pursuant to notice, at the offices of
      McCARTER & ENGLISH, CityPlace I, 185 Asylum Street,
19    Hartford, Connecticut, on Thursday,
      November 10, 2005 scheduled to commence at
20    approximately 1:00 p.m.
21
22
23                Tina M. Davis, LSR
                   License No. 00221
24            Brandon Smith Reporting Service
                   44 Capitol Avenue
25               Hartford, CT  06106
                   (860) 549-1850
```

Page 310

1   objective with search and development products is," et
2   cetera, et cetera, 70 percent?
3       A. 70 percent is our target.
4       Q. But when I read that it looked to me like it was
5   suggesting that your target might be something different
6   for products that weren't search and development
7   products, and that's what I'm trying to understand.
8       A. No, that's not what it means. We're going to
9   apply the same objectives for gross margin to products
10  regardless of their origin.
11      Q. Okay. On page 34479 it says, "Our goal is to
12  evolve to gross margins of 70 percent in the USA,
13  50 percent in the rest of the world." By that I --
14      A. That's right.
15      Q. -- assume that that means that the company is
16  currently not at that goal yet; is that right?
17      A. That's right.
18      Q. Now, under the section entitled Implementation
19  Plan, all of which has been erased or redacted on
20  page 34483, what generically would have been included in
21  this category? Would this be how you would describe how
22  you're going to implement getting to your goal?
23      A. I don't know. I don't recall what's been
24  redacted.
25      Q. Who is responsible for preparing the strategic

Page 311

1   plan?
2       A. The management staff.
3       Q. So if you don't know what would have been under
4   this section, who would know that?
5       A. There was no -- there was no implementation plan
6   in this document. What this would have said would have
7   referred on to other plans, other departmental plans not
8   included in the strategic plan.
9       Q. Other departmental plans?
10      A. Just more categorical plans.
11      Q. Has AngioDynamics conducted any studies of the
12  laser emitting properties of the tip of a fiber after
13  procedure has been done with VenaCure?
14      A. Not that I'm aware of.
15      Q. Are you aware of whether any laser energy emits
16  from anything other than the flat face of the fiber
17  after or during the course of a procedure?
18      A. Repeat that question, please.
19      Q. Yes.
20          Do you know one way or the other whether any
21  laser energy is emitted by the tip of a fiber from, say,
22  the side of the tip, rather than the front of the tip
23  during the course of a VenaCure procedure?
24      A. It's my opinion that there is no energy laser
25  energy emitted from the side of a fiber during the

Page 312

1   course of a procedure.
2       Q. My question is do you know one way or the other
3   whether that's the case based on any evidence that you
4   have had brought to your attention by anyone or anything
5   that you've done yourself to make that determination?
6       A. I don't know one way or another. I have not done
7   any testing.
8       Q. Okay. If someone were to say that the cladding
9   degrades on the side of the tip during the course of a
10  procedure and that laser energy emits from the side.
11  You wouldn't know one way or the other whether they're
12  right or wrong?
13          MR. BRIGHT: Objection to the form of the
14  question, foundation. It's a hypothetical. You can
15  answer if you can.
16  BY MR. ALBERT:
17      Q. Well, I think that's what you said before. I'm
18  just making sure.
19      A. Say that again.
20      Q. Yes. If you were shown evidence that energy
21  emits from the side of the fiber tip because the
22  cladding has degraded during the course of a procedure,
23  my question is do you have any evidence one way or the
24  other as to whether that is true?
25          MR. BRIGHT: Objection to the form of the

Page 313

1   question. You can answer it.
2       A. I do not have any evidence.
3   BY MR. ALBERT:
4       Q. You're not aware that the company has any such
5   evidence; right?
6       A. I'm not aware of it.
7       Q. Or any expert witness who is consulting on behalf
8   of the company in this lawsuit?
9       A. Not that I'm aware of.
10      Q. I'd like to ask you what the basis is for
11  AngioDynamics contention that the 777 patent is invalid?
12      A. That the -- a few examples would be that relevant
13  prior art was not disclosed to the patent office during
14  the prosecution of a patent, prior art that was known by
15  inventors at the time.
16      Q. Okay. Are you referring to the information
17  that's discussed in the reports provided by Dr. Sampson
18  and by Mr. Sunstein?
19      A. Yes, I am.
20      Q. Okay. Is it the company's position that those
21  reports and that the testimony provided by those two
22  individuals represents the company's position as to why
23  the patent is invalid or unenforceable?
24      A. There may be additional arguments to be made, but
25  those -- those expert reports contain some of the

Page 314

1  reasons we feel that the patent is invalid.
2      Q. All right. I'd like to know what all the reasons
3  are. We have a very detailed report from Mr. Sunstein,
4  a very detailed report from Dr. Sampson, accompanying
5  materials, and in both cases some expert testimony that
6  has been given at depositions. I'd like to know whether
7  the company has any other basis, other than what's in
8  those expert reports and the accompanying materials, for
9  taking the position that the patent is invalid?
10     And I ask you that as the 30(b)(6) witness of the
11 company if you want to confer with counsel to understand
12 what that means. That's what I'd like to know.
13     MR. BRIGHT: Just the -- well, let me just
14 talk to you for a second.
15     THE WITNESS: Yes.
16
17     (Off the record.)
18
19     MR. BRIGHT: Let me also say that I don't
20 have in front of me our interrogatory responses, and
21 there may be --
22     MR. ALBERT: You can add to that to the list
23 of things that are the basis for the company's position
24 or not.
25     MR. BRIGHT: That's all I'm saying.

Page 315

1      MR. ALBERT: Okay.
2      MR. BRIGHT: In addition to what's in the
3  expert reports and in the interrogatory responses and
4  then whatever else Mr. Appling wants to add.
5      MR. ALBERT: All right. Just so we're
6  clear, Mr. Appling was identified as the 30(b)(6)
7  witness on this topic?
8      MR. BRIGHT: You are correct. Your question
9  is absolutely appropriate. He's the witness on this.
10     A. State the question again, please.
11 BY MR. ALBERT:
12     Q. Yes.
13     Other than the expert reports of Mr. Sunstein,
14 Dr. Sampson and the materials that they replied on and
15 statements that they made in their depositions and other
16 than the interrogatory responses that have been provided
17 to us by AngioDynamics through counsel, are you aware of
18 any basis to believe that the 777 patent is invalid?
19     A. I'm aware that Mr. Sunstein's report focused on
20 the -- mainly on --
21     THE WITNESS: Is it O'Neil?
22     MR. BRIGHT: O'Riley.
23     THE WITNESS: O'Riley. I'm sorry.
24     A. -- O'Riley's reference.
25     In my opinion, the Salat Spanish patent, which

Page 316

1  wasn't discussed, I don't believe, in Sunstein's report
2  was also pretty relevant. Although, it was disclosed in
3  the patent prosecution, I don't think they adequately
4  disclosed that Salat had discussed that the device in
5  his Spanish patent could have been a laser device, as
6  well.
7  BY MR. ALBERT:
8      Q. So it's your position that although the Salat
9  Spanish patent was disclosed to the patent office, you
10 feel that there was something about that patent that was
11 not disclosed?
12     A. In the -- the inventors submitted, I believe, an
13 IDS with the Salat patent, but provided the explanation
14 that that was an electric coagulation device, not a
15 laser device. The actual teachings of that patent was
16 discussed laser.
17     Q. Okay. Do you have any knowledge one way or the
18 other as to whether disclosure of a reference without
19 sufficiently describing what it is to the patent office
20 does or doesn't make the patent enforceable?
21     MR. BRIGHT: Objection, calls for a legal
22 conclusion.
23 BY MR. ALBERT:
24     Q. Well, that's fine. If your answer is that you're
25 not a lawyer and so you don't know, that's fine. I just

Page 317

1  want to know what your position is.
2      A. My position is that if the examiner understood
3  that Salat had -- that that device was a laser or
4  electric coagulation device, that that would have had an
5  impact on the patent prosecution.
6      Q. What makes you believe that wasn't disclosed to
7  the patent office?
8      A. I've read the file history.
9      Q. What is it that specifically should have been
10 said to the patent office, in your opinion, that wasn't
11 said?
12     A. It's my opinion that he should have said that
13 device should have been or could have been or was
14 explained in the patent -- I believe it was a Spanish
15 patent, originally in Spanish anyway. That in his
16 explanation he should have stated that his teachings
17 included that that product was either an electric
18 coagulation device or a laser device.
19     Q. You don't know one way or the other whether that
20 would have made a difference to the patent examiner; is
21 that right?
22     A. I don't know.
23     Q. You're not a patent lawyer?
24     A. I'm not a patent lawyer.
25     Q. Do you know why Mr. Sunstein's expert report

Page 318
1  didn't mention that issue that you're raising now for
2  the first time?
3       MR. BRIGHT: Objection, foundation.
4    A. I don't know why.
5  BY MR. ALBERT:
6    Q. Other than what you've now told me and the list
7  that we put in the record a couple minutes ago, is there
8  anything else that you believe undermines the validity
9  of the 777 patent?
10   A. I'm not sure if Sunstein's report included
11 Bukaliasin (phonetic) and a few other references.
12   Q. I have it here if you want to see it. Or is your
13 answer that you just want to add certain references to
14 the record?
15   A. No. You asked me a question, and I was trying to
16 answer it.
17   Q. I'm sorry. I didn't mean to interrupt if you
18 were in the middle of giving your answer. Here is his
19 report.
20   A. Okay. The one that appears to be missing is my
21 feelings on Salat.
22   Q. Okay. Nothing else?
23   A. Not that I know of.
24   Q. Is there any other basis other than what you've
25 testified to in your first deposition for your company's

Page 319
1  position that it doesn't infringe the patent?
2       MR. BRIGHT: Objection to the form of the
3  question.
4  BY MR. ALBERT:
5    Q. And you can add to that all of your expert
6  reports and all of your interrogatory answers.
7       MR. BRIGHT: That's fine. I just don't -- I
8  don't know if the witness remembers what he said in his
9  first deposition, and I don't want it to be a memory
10 test as to what he said at his first deposition on
11 infringement.
12 BY MR. ALBERT:
13   Q. Okay. I don't want to repeat everything that we
14 went through at his deposition.
15      MR. BRIGHT: I agree.
16      MR. ALBERT: So let me just ask him to the
17 best of his knowledge today whether he has any by basis
18 other than what he's previously testified to or what the
19 experts have covered in their analyses or the
20 interrogatory answers for your position that you don't
21 infringe the patent. I just want to know if there's
22 anything new that --
23   A. I have nothing new to add.
24 BY MR. ALBERT:
25   Q. Have you ever discussed with Dr. Andrews the

Page 320
1  issue of how the laser vein treatment procedure works?
2    A. Not that I recall.
3    Q. Were you at his presentation at SIR in
4  New Orleans this year?
5    A. I don't remember if I was.
6    Q. Are you familiar with Exhibit 352 that we marked
7  earlier today which is a three-page abstract of
8  Dr. Andrew's presentation?
9    A. I don't remember having had looked at it before.
10   Q. Okay. Have you discussed the issue with
11 Dr. Andrews of whether steam bubbles cause the damage to
12 the vein wall or whether something else causes the
13 damage to the vein wall during a VenaCure procedure?
14   A. I don't recall having that conversation with
15 Dr. Andrews.
16   Q. Do you recall discussing with Dr. Andrews the
17 issue of whether contact happens between the fiber tip
18 and the vein wall during the VenaCure procedure?
19   A. Repeat the question.
20      MR. ALBERT: Could you read it back,
21 please?
22
23      (The previous question was
24      repeated by the court reporter.)
25

Page 321
1    A. I don't recall having that conversation.
2  BY MR. ALBERT:
3    Q. Is it AngioDynamics' position that, as
4  Dr. Kabnick teaches, a 10 millimeter of tumescent
5  anesthesia should be placed around the vein prior to
6  starting a laser?
7    A. Well, that's in our Instructions For Use
8  currently.
9    Q. Is it your position that doctors should follow
10 your Instructions For Use?
11   A. That would be the purpose of the
12 Instructions For Use.
13   Q. But you've never discussed these issues with
14 Dr. Andrews?
15   A. I have never discussed a 10 millimeter wheel with
16 Dr. Andrews.
17   Q. Do you have any knowledge of whether Dr. Andrews
18 believes that contact happens between the fiber tip and
19 the vein wall during the course of a VenaCure procedure?
20   A. I have seen Dr. Andrews -- a slide in one of his
21 presentations that said something about contact. I
22 can't recall the detail of it.
23   Q. If you look at the first page of Exhibit 532, do
24 you see under Definitions and Goals where he says, "The
25 goals of tumescent anesthesia are threefold." And after